UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| JENNIFER REBECCA KITZERO, <br><br> Plaintiff, <br><br> vs. <br><br> NANCY A. BERRYHILL, Acting Commissioner, Social Security Administration, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 5:17-CV-1860-CLS |

**MEMORANDUM OPINION AND ORDER**

Claimant, Jennifer Kitzero, commenced this action on November 3, 2017, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner, affirming the decision of the Administrative Law Judge ("ALJ"), and thereby denying her claim for a period of disability and disability insurance benefits. For the reasons stated herein, the court finds that the Commissioner's ruling is due to be affirmed.

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of review is limited to determining whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and whether correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253

(11th Cir. 1983).

Claimant contends that the Commissioner's decision is neither supported by substantial evidence nor in accordance with applicable legal standards. Specifically, claimant asserts that: (1) the ALJ's decision about what jobs plaintiff is capable of performing was not supported by substantial evidence; (2) the ALJ improperly considered the consultative examiner's opinion; (3) the ALJ improperly rejected findings by a counselor at the Alabama Department of Rehabilitation; and (4) the ALJ improperly evaluated whether claimant had the ability to obtain additional medical treatment. The court will address all of those issues, but in a slightly different order than they were presented by claimant. Upon review of the record, the court concludes that claimant's contentions are without merit.

**A.     Consultative Examiner's Opinion**

Social Security regulations provide that, in considering what weight to give any medical opinion, the Commissioner should evaluate: the extent of the examining or treating relationship between the doctor and patient; whether the doctor's opinion can be supported by medical signs and laboratory findings; whether the opinion is consistent with the record as a whole; the doctor's specialization; and other factors. *See* 20 C.F.R. § 404.1527(c). *See also Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) ("The weight afforded a physician's conclusory statements depends

upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments.").

Katie Lewallen, Ph.D., a licensed psychologist, examined claimant on December 2, 2014. Claimant reported to Dr. Lewallen that she suffered a traumatic brain injury in a 2000 automobile accident. Claimant lived with her parents and reported daily activities including self care, watching television, cleaning the house, going out with her mother, and helping her mother cook. She reported having "a very hard time following directions or instructions," and being unable to cook by herself, drive, shop alone, or manage her finances independently. Dr. Lewallen administered the Wechsler Adult Intelligence Scale (WAIS-IV) test, which resulted in verbal comprehension and perceptual reasoning scores in the low average range, working memory scores in the average range, and processing speed scores in the borderline range. During the clinical examination, Dr. Lewallen observed claimant experiencing some difficulties with depth perception, including needing to hold on to the wall while walking. She also observed claimant looking away when she was talking. Claimant presented as "somewhat immature" for her age. She was not able to complete the serial 7's exercise, but she could count backward from 20 and spell the word "world" backwards. Her immediate and remote memory were within normal limits, but her recent memory "appeared impaired," and her fund of information was

poor. She was fully oriented, well-groomed, and, despite the observation that she sometimes looked away during a conversation, Dr. Lewallen stated that she maintained "average" eye contact. Her speech was logical and coherent, and her response to humor was good. Her mood was euthymic, her affect congruent, and her demeanor playful and friendly. She was cooperative, but her motor activity was slowed. Her thought content, insight, and judgment all were average, but her memory and fund of knowledge were below average. Dr. Lewallen's diagnostic impression was mild neurocognitive disorder, including visual-perceptual details, as a result of traumatic brain injury. Dr. Lewallen found that claimant's "overall level of social and adaptive functioning appears moderately to severely impaired," and her prognosis for employment was "poor." While claimant appeared to have the motivation to work, she "would likely require significant training and supervision to manage work responsibilities and accommodate her visual impairment." Dr. Lewallen's summary observations were as follows:

> Jennifer and her mother Regina reported significant deficits with visual perception and short-term memory as a result of traumatic brain injury. She does not take any medication and reported few physical health concerns outside the context of her TBI. Functional limitations include deficits following instructions and managing overall life responsibilities. She is highly dependent on her family for assistance at this time. Results of the WAIS-IV indicate that her working memory falls in the average range of functioning; however, I recommended additional testing to assess her overall memory functioning, particularly delayed recall.

4

Tr. 371-74.

The ALJ afforded little weight to Dr. Lewallen's opinions because they were "not supported by and are inconsistent with the overall weight of the evidence in the record as a whole."[1] That decision was consistent with applicable law and supported by substantial evidence. As an initial matter, the ALJ was not required to accept Dr. Lewallen's statement that claimant's prognosis for employment was poor, because the decision of whether a claimant is disabled is not a medical opinion, but is a decision "reserved to the Commissioner." 20 C.F.R. §§ 404.127(d). Additionally, while claimant makes much of the ALJ's decision not to place significant weight on the results of Dr. Lewallen's psychometric testing, those results do not do much to advance claimant's disability status. While claimant's processing speed scores fell within the borderline range, her other subscores *and her composite score* fell within the average and low average ranges. The ALJ accounted for deficits in claimant's intellectual functioning by adding non-exertional limitations to claimant's residual functional capacity finding. The other evidence in the record also is consistent with Dr. Lewallen's assessment. Claimant relies upon a discharge note from the initial hospital stay following her 2000 accident, which states that her attention span, judgment, and insight were poor,[2] but that statement says very little about her current

---

[1] Tr. 28.
[2] Tr. 306.

level of functioning, especially considering that claimant has worked several different jobs during the many years since her accident. Claimant also argues that the ALJ was wrong to credit the opinions of consultative physical examiner Dr. Sherry Lewis and state agency physician Dr. Samuel Chastain over that of Dr. Lewallen, because Dr. Lewis and Dr. Chastain did not perform standardized testing and did not have access to Dr. Lewallen's test results. That point also is of little consequence, as Dr. Lewis and Dr. Chastain were engaged to provide opinions about claimant's *physical* abilities, not her *mental* limitations. In summary, the record does not reflect that claimant has received much treatment for her mental condition, and there is no evidence that she experiences any mental limitations greater than those imposed by the ALJ.

**B.     Vocational Rehabilitation Counselor's Opinion**

Claimant also asserts that the ALJ improperly considered the assessment from Lillian Butler, her counselor at the Alabama Department of Rehabilitation Services. Ms. Butler submitted a letter dated March 28, 2016, and stating:

> Please be advised that Jennifer Kitzero has been a client of the Alabama Department of Rehabilitation Services since May 27, 2015. She is participating in our supported employment program, which is designed to help people who have the most significant disabilities gain and maintain employment. Although Jennifer has significant workplace limitations, which you can surmise from the attached medical records and ADRS determinations, we have great hope that we will be able to help her gain and maintain employment in the future.

6

Tr. 386. The attached "Functional Limitation/Priority Assessment" form, which was completed on October 10, 2015, and described limitations that were "evident from observation," stated that claimant:

> . . . is not capable of independently leaving the home/moving about in the community. Requires accompaniment, monitoring and/or physical assistance for mobility.
>
> . . . presently and/or recurrently demonstrates limitations that often require accompaniment or assistance to leave the home or navigate in the community.
>
> . . . in a manner other than those described above, has a diminished ability to independently walk, climb stairs or a ladder, or sustain a standing or seated position.

Tr. 387 (ellipses in original). With regard to communication skills, the form stated that claimant:

> . . . is non-verbal or else substantially impoverished/limited in his or her use of formal language, even within chosen/primary mode of communication. Includes a person who requires an intermediary with personal knowledge or history with the individual.
>
> . . . has limited capacity to retain verbal or written communication which affects the ability to follow-through with instructions or work tasks.
>
> . . . has limited or impoverished expressive or receptive language skills that result in not being understood by others or the misrepresentation of verbal or written communication. Occurs to an extent that adversely affects personal and work interactions.
>
> . . . does not perceive or often misinterprets auditory or visual information (including body language) to an extent that noticeably

7

diminishes effective communication in the workplace or in training.

Tr. 387 (ellipses supplied). With regard to self-direction, claimant:

> . . . cannot direct his or her own care; relying instead upon others to establish health routines, obtain & dispense medication, choose a healthy diet, structure an environment to avoid/remove risk, may require a "Payee" for benefits other than self (if over 18).
>
> . . . demonstrates limited abilities to self-correct, anticipate the outcome of negative choices, and/or change behavior in response to feedback.
>
> . . . is unlikely to or has demonstrated the inability to independently recognize and/or avoid hazardous, unsafe conditions.
>
> . . . experiences or has a history experiencing negative consequences as a result of difficulties with independent planning/managing/solving of personal or work related tasks.
>
> . . . has a limitation with reliably handling and managing personal affairs which requires frequent or periodic external supports or reminders.
>
> . . . across multiple circumstances and settings has difficulty remaining on task or is easily distracted which results or has resulted in a negative impact upon his/her performance as evidenced in past work or training.

Tr. 388 (ellipses in original). With regard to interpersonal skills, claimant:

> . . . has a current or recurrent pattern of antisocial behavior (aggression, impulsiveness, irresponsibility, hostility, marked emotional immaturity, poor judgment, or lack of empathy) to an extent that interferes with the ability to gain or maintain a job.
>
> . . . engages in socially inappropriate, excessive, illogical, or irrelevant speech or behaviors resulting in negative consequences such

8

as ridicule, exclusion from a group, being passed over in interviews, or fired from a job.

> . . . has problems with the perception of social cues and boundaries which negatively affects relationships in the workplace.
>
> . . . has or has a recurring history of difficulty controlling and managing emotions in the context of interpersonal relationships or public settings resulting in negative consequences.
>
> . . . is easily led or influenced by others resulting in negative social or vocational consequences.

Tr. 388 (ellipses in original). With regard to endurance and stamina, claimant:

> . . . has a limitation in tolerance for certain environmental conditions that reduces opportunities for workplace participation or the time that may be spent within a particular location.
>
> . . . is (or will be) limited to a range of jobs with sedentary/light physical activity or low-stress in order to sustain work activities.
>
> . . . often takes longer to perform or complete tasks due to differences inherent of the disability, affecting the manner, duration and intensity of physical or mental exertion.
>
> . . . is (or will be) dependent upon assistive technology, accommodations, and/or other strategies for reasons of endurance or stamina.

Tr. 388 (ellipses in original). With regard to job skills, claimant:

> . . . has limitations that suggest the need for long-term on-the-job supports (those extending well beyond case closure) for the satisfactory performance of work tasks.
>
> . . . cannot reliably perform the most basic arithmetic computations (simple mental math, estimating time, or making change).

9

>    . . . has a diminished capacity to apply previously learned "transferable-skills." Difficulty generalizing from one task to another across varied work settings.
>
>    . . . lacks an appropriate understanding of work place rules, customs, etiquette (ex. showing up on time, conversation or language appropriate to work, accepting constructive criticism, or showing respect to supervisor).

Tr. 389 (ellipses in original). Claimant was recommended for job readiness training, job search and placement assistance, a supported employment program, and vocational guidance and counseling. The completion of all services claimant would require was expected to take between six months and two years. When claimant's scores for her functional limitations, anticipated services, and anticipated duration of services were added together, she was placed within the category of "most significantly disabled."[3]

The ALJ afforded Ms. Butler's assessment very little weight, however, because Ms. Butler was not "an acceptable medical source within the meaning of the Social Security Act, and because [her opinions] are not supported by and are inconsistent with the overall weight of the evidence in the record as a whole."[4] Claimant concedes that Ms. Butler was not an "acceptable medical source" according to Social Security regulations.[5] *See* 20 C.F.R. §§ 404.1502(a), (e)(3). Accordingly, her assessment does

---

[3] Tr. 389-90.

[4] Tr. 28 (alteration supplied).

[5] Doc. no. 7 (claimant's brief), at 29-30 ("The ALJ is correct, the Alabama Department of Rehabilitation provides vocational training and rehabilitation and not medical treatment.").

not need to be considered as a medical opinion, or afforded any particular weight in the disability determination process. 20 C.F.R. § 404.1527(a)-(c). Social Security regulations contain the following guidelines for evaluating evidence from medical sources:

> (1) Consideration. Opinions from medical sources who are not acceptable medical sources and from nonmedical sources may reflect the source's judgment about some of the same issues addressed in medical opinions from acceptable medical sources. Although we will consider these opinions using the same factors as listed in paragraph (c)(1) through (c)(6) in this section, not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case. Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole.
>
> (2) Articulation. The adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration

levels, if the determination is less than fully favorable.

20 C.F.R. § 404.1527(f). The ALJ followed those regulations when considering Ms. Butler's assessment. She was not required to afford any particular weight to that assessment because Ms. Butler is not an acceptable medical source, and her decision to reject the assessment was supported by substantial evidence. As will be discussed more fully below, the medical record as a whole does not support the imposition of disabling limitations. Moreover, despite claimant's contrary suggestion, the Alabama Department of Rehabilitation Services does not employ the same standards for determining disability as the Social Security Administration, and an evaluation by a vocational rehabilitation counselor is not a substitute for the testimony of a vocational expert contracted by the Commissioner.

C.     **Claimant's Ability to Obtain Treatment**

As one factor in evaluating the credibility of claimant's subjective complaints, the ALJ considered that she had several gaps in treatment during the relevant period, including December 28, 2013 to November 9, 2014, November 11, 2014 to December 1, 2014, December 3, 2014 to March 2, 2015, and March 14, 2015 to October 14, 2015.[6] The ALJ also stated:

> While the claimant alleges she did not have health insurance or the money to obtain the treatment she needed for her impairment during the period in question, the evidence indicates she was never prescribed

---

[6] Tr. 24-25.

12

> or needed any for it. There is also no evidence in the record that the claimant was ever denied any treatment due to her alleged inability to pay for it either.[*sic*] There is also no indication in the record that claimant ever attempted to obtain any of the treatment she alleges she needed for her impairment at her local County Health Department or area Free Clinic where she could have obtained the same free of charge. Therefore, the undersigned finds the claimant's allegations of not being able to obtain the treatment she needed for impairment during the pertinent period because of financial considerations, are less than fully accurate . . . .

Tr. 26.

Claimant first challenges the ALJ's finding on the basis that there were no further treatment options available to plaintiff, but she offers nothing more than speculation to support that argument. None of the treating or consultative sources who have examined claimant have suggested that she had no options for further treatment, and there is no other evidence in the record to suggest that claimant's options had been exhausted.

Claimant also asserts that the ALJ failed to properly account for her inability to afford further treatment. It is well settled that "poverty excuses [a claimant's] noncompliance" with medical treatment. *Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir. 1988) (alteration supplied). Thus, "while a remediable or controllable medical condition is generally not disabling, when a 'claimant cannot afford the prescribed treatment *and can find no way to obtain it*, the condition that is disabling in fact continues to be disabling in law.'" *Id.* (quoting *Taylor v. Bowen,* 782 F.2d

1294, 1298 (5th Cir. 1986)) (emphasis supplied). The Eleventh Circuit has also held that "when an ALJ relies on noncompliance as the *sole ground* for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (citing *Dawkins,* 848 F.2d at 1214) (emphasis supplied).

Here, claimant testified that she did not have health insurance, could not afford medical treatment without insurance, and had no family who could pay for her treatment.[7] While the ALJ stated there is no indication that claimant attempted to obtain free or subsidized treatment, there also is no evidence that she *did not* attempt to do so, because the ALJ did not inquire as to claimant's efforts during the administrative hearing. Despite those failures of the evidence, however, it is clear that claimant's failure to seek additional treatment was not the sole ground for the ALJ's decision not to fully credit claimant's subjective complaints. As discussed more fully below, the ALJ also relied upon claimant's educational and vocational history, the limited medical evidence that was in the record (including the assessment of the consultative physical examiner), claimant's reports of functional activities, and various inconsistencies in claimant's testimony. Thus, the ALJ's consideration of

---

[7] Tr. 49.

claimant's failure to seek additional treatment was, if anything, harmless error. *See Beegle v. Social Security Administration, Commissioner,* 482 F. App'x 483, 487 (11th Cir. 2012) ("[T]he ALJ must consider evidence showing that the claimant is unable to afford medical care before denying disability insurance benefits based upon the claimant's non-compliance with such care. . . . Nonetheless, reversible error does not appear where the ALJ primarily based her decision on factors other than non-compliance, and where the claimant's non-compliance was not a significant basis for the ALJ's denial of disability insurance benefits.") (citing *Ellison,* 355 F.3d at 1275-76) (alterations supplied).

## D. Substantial Evidence Supporting The ALJ's Residual Functional Capacity Finding

Claimant also asserts that the ALJ improperly evaluated her ability to perform substantial gainful activity despite her impairments.[8] In addition to the issues previously discussed, claimant asserts that the ALJ improperly considered much of the evidence when evaluating her subjective symptoms. To demonstrate that pain or another subjective symptom renders her disabled, claimant must "produce 'evidence

---

[8] In her initial brief, claimant argued that the ALJ erred in finding that claimant's impairments would not prevent her from doing her past work. Doc. no. 7 (claimant's brief), at 12. That argument was misplaced, because the ALJ actually found that claimant was *unable* to perform her past relevant work, but that she *could* perform other jobs existing in significant numbers in the national economy. Tr. 29. Claimant corrected that error in her reply brief. Doc. no. 12 (claimant's reply brief), at 1-2. In any event, the error was harmless, because all of the arguments she asserts in both briefs apply equally, regardless of what jobs the ALJ considered claimant capable of performing.

15

of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain.'" *Edwards v. Sullivan*, 937 F. 2d 580, 584 (11th Cir. 1991) (quoting *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)). If an ALJ discredits subjective testimony on pain, "he must articulate explicit and adequate reasons." *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing *Jones v. Bowen*, 810 F.2d 1001, 1004 (11th Cir. 1986); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)). Furthermore, "[a]fter considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir. 1992) (citing *Wilson v. Heckler,* 734 F.2d 513, 517 (11th Cir. 1984)) (alteration supplied). The following factors can be considered in evaluating the credibility of a claimant's allegations of pain:

> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

16

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

The ALJ articulated ample reasons for not finding claimant's allegations completely credible, including lack of support in the medical record, the assessment of the physical consultative examiner, claimant's daily activities and work history, and various inconsistencies in the record. Claimant raises many challenges to the ALJ's findings.[9] For example, she asserts that the ALJ improperly considered her educational background. The ALJ noted that claimant "did not require any special education classes in school after she recovered from her motor vehicle accident, and . . . she subsequently graduated and received a regular diploma."[10] She also noted that claimant attended college "for a while" and obtained a Certified Nurse's Assistant Certificate in 2009.[11] Claimant asserts that her receipt of a high school diploma does not reflect the true nature of her abilities, because she passed all of her graduation exit

---

[9] Some of those challenges have already been discussed and will not be repeated here.
[10] Tr. 24 (ellipsis supplied).
[11] *Id.*

17

examinations before her motor vehicle accident, and she was placed at an institution called "Sharp Learning Center," and then homeschooled, after the accident. The record does not contain any information about Sharp Learning Center, so there is no evidence to support claimant's assertion that she was forced to take special education classes there. Moreover, the record reflects that claimant obtained her Certified Nursing Assistant certification from Drake Technical College, which is consistent with the ALJ's finding.[12]

Claimant also asserts that the ALJ improperly considered her employment history. The ALJ pointed out the following as one of the inconsistencies in the record: "She testified she was fired from all of her nursing home jobs during the 30-90 day probationary period, but the evidence reveals she worked at the Regency Manor Nursing Home for well over a year."[13] It is true that claimant testified that she worked for Regency Manor for close to a year.[14] She then testified that "[a]ll the nursing home jobs were supposed to be full-time," but she "always [gets] fired" before the probationary period, so the Regency Manor job was her only full-time nursing home job.[15] The court agrees with claimant that the ALJ did not accurately describe claimant's testimony on this topic. Even so, the ALJ's consideration of

---

[12] *See* Tr. 24, 173, 252, 361.
[13] Tr. 27.
[14] Tr. 42.
[15] Tr. 45 (alterations supplied).

18

claimant's employment history as a whole was supported by substantial evidence. It was reasonable for the ALJ to draw the inference that claimant's ability to work, albeit somewhat sporadically, after her accident indicated that claimant's condition improved over time.

Claimant quibbles with other aspects of the ALJ's credibility finding, but her arguments are not sufficient to undermine the ALJ's decision. Claimant may interpret some of the record evidence differently from the ALJ, and a different ALJ may also have interpreted the evidence differently. Even so, the relevant consideration is not whether the ALJ offered the best possible explanation or interpretation of the evidence, but whether the ALJ's consideration of the evidence was supported by substantial evidence. *See Werner v. Commissioner of Social Security*, 421 F. App'x 935, 939 (11th Cir. 2011) ("The question is not, as Werner suggests, whether ALJ could have reasonably credited his testimony, but whether the ALJ was clearly wrong to discredit it."). Here, there was substantial evidence to support the ALJ's finding.

**E.    Conclusion and Order**

In summary, the court concludes the ALJ's decision was based upon substantial evidence and in accordance with applicable legal standards. Accordingly, the decision of the Commissioner is AFFIRMED. Costs are taxed against claimant. The Clerk is directed to close this file.

DONE this 18th day of May, 2018.

                                                                       /s/ Lynwood Smith
                                                                       United States District Judge